Minute Order Form (06/97)

556

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | WILLIAM T. HART | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 98 C 2142 | DATE | APRIL 12, 2001 |
| CASE TITLE | MARK J. BENNER v. E. McADORY, etc., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Defendants' motion to strike [88-1] is denied without prejudice. Defendants' motion for summary judgment [76-1] is granted. The Clerk of the Court is directed to enter judgment in favor of defendants and against plaintiff dismissing plaintiff's cause of action with prejudice.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 4 number of notices | |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | APR 13 2001 date docketed | |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | IS docketing deputy initials | 90 |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | 4/12/01 date mailed notice | |
| CW | courtroom deputy's initials | Date/time received in central Clerk's Office | MQM mailing initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
APR 13 2001

MARK J. BENNER, )
 )
       Plaintiff, )
 )
v. ) No. 98 C 2142
 )
E. McADORY, Superintendent, )
SGT. WRIGHT, J. YARBROUGH, )
Officer, and OFFICER RAY, )
 )
       Defendants. )

## MEMORANDUM OPINION AND ORDER

As of April 12, 1996, plaintiff Mark Benner was incarcerated at Stateville Correctional Center in Joliet, Illinois and housed in Unit I, a disciplinary segregation unit. All the defendants were assigned to Unit I on that date. Defendant Eugene McAdory was the unit superintendent, defendants James Yarbrough and Freddie Ray were correctional officers, and defendant Clarence Wright was a sergeant. Inmate Robert Felton was housed in the cell next to plaintiff's cell. On that date, Felton scalded plaintiff with hot water when plaintiff, without an escort, approached Felton's cell to retrieve his legal papers. Plaintiff alleges that defendants acted with deliberate



indifference in failing to prevent this assault.[1] Presently pending is defendants' motion for summary judgment.[2]

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. Schneiker v. Fortis Insurance Co., 200 F.3d 1055, 1057 (7th Cir. 2000); Baron v. City of Highland Park, 195 F.3d 333, 337-38 (7th Cir. 1999). The burden of establishing a lack of any genuine issue of material fact rests on the movant. Wollin v. Gondert, 192 F.3d 616, 621-22 (7th Cir. 1999); Essex v. United Parcel Service, Inc., 111 F.3d 1304, 1308 (7th Cir. 1997). The nonmovant, however, must make a showing sufficient to establish any essential element for which he will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Shank v. William R. Hague, Inc., 192 F.3d 675, 681 (7th Cir. 1999); Wintz v. Northrop Corp., 110 F.3d 508, 512 (7th Cir. 1997). The movant need not provide affidavits or deposition

---

[1] Plaintiff is represented by appointed counsel, who has performed his duties admirably. The court expresses its gratitude for the work provided by counsel.

[2] Defendants also move to strike portions of plaintiff's Local Rule 56.1 statement of additional facts. That motion will be denied without prejudice. Rather than striking any particular factual assertion, only properly supported factual material will be considered in determining if a genuine issue of material fact exists. Most of defendants' objections, however, are without merit.

testimony showing the nonexistence of such essential elements. Celotex, 477 U.S. at 324. Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. See NLFC, Inc. v. Devcom Mid-America, Inc., 45 F.3d 231, 236 (7th Cir.), cert. denied, 515 U.S. 1104 (1995); Covalt v. Carey Canada, Inc., 950 F.2d 481, 485 (7th Cir. 1991); Collins v. Associated Pathologists, Ltd., 844 F.2d 473, 476-77 (7th Cir.), cert. denied, 488 U.S. 852 (1988). As the Seventh Circuit has summarized:

> The moving party bears the initial burden of directing the district court to the determinative issues and the available evidence that pertains to each. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); id. at 325 ("the burden on the moving party may be discharged by 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case"). Then, with respect to issues that the non-moving party will bear the burden of proving at trial, the non-moving party must come forward with affidavits, depositions, answers to interrogatories or admissions and designate specific facts which establish that there is a genuine issue for trial. Id. at 324. The non-moving party cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine triable issue. Id. The

> non-moving party "must do more than simply show
> that there is some metaphysical doubt as to the
> material facts." <u>Matsushita Elec. Indus. Co. v.
> Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). "The
> mere existence of a scintilla of evidence in
> support of the [non-moving party's] position will
> be insufficient; there must be evidence on which
> the jury could reasonably find for the [non-moving
> party]." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.
> 242, 252 (1986).

<u>Selan v. Kiley</u>, 969 F.2d 560, 564 (7th Cir. 1992).

Resolving all genuine factual disputes in plaintiff's favor and drawing all reasonable inferences in plaintiff's favor, the facts assumed to be true for purposes of summary judgment are as follows. Plaintiff had been incarcerated at Stateville since May 1994. He was originally housed in protective custody. In June 1995, he was assigned to disciplinary segregation in Unit I. On April 12, 1996, plaintiff was confined in a single cell on the third floor of Unit I's G Wing ("3-G"). Unit I is the disciplinary segregation unit, housing inmates who have been found guilty of serious rule infractions such as assault, escape, weapons violations, possession of drugs, and possession of gang literature. There is no protective custody within Unit I, but the stated procedures for Unit I are more restrictive than those for protective custody. Also, a person who was targeted by others could, if possible within Unit I, be moved away from the persons that threatened him. Also, on occasion, Unit I inmates

- 4 -

facing security risks were transferred to the Health Care Unit, X-House, or the Special Evaluation Unit.

As of April 1996, electric immersion heaters ("stingers") were prohibited in Unit I. However, the ban had been put in place approximately two months earlier and not all stingers had yet been seized. Contraband was seized during shakedowns that were performed approximately every 30 days. However, Felton's cell had not been searched recently. Also, it was possible for inmates to smuggle stingers into Unit I.

As of April 1996, Unit I inmates were to be escorted in chains whenever they were moved to or from their cells. While being escorted, an inmate's hands were cuffed behind his back. Occasionally, the mandatory escort policy would not be followed. Also, on occasion inmates would move without their escorts. Plaintiff did not have a history of moving without his escort.

Around noontime on April 12, 1996, defendant Yarbrough came to plaintiff's cell, handcuffed plaintiff, and removed plaintiff to take him to sick call on the first floor of Unit I. Yarbrough, however, left plaintiff unescorted in the 3-G dayroom. Benner continued down to the lower level health unit unescorted. After being seen with complaints of back and knee pain, no one was there to escort plaintiff back to his cell. There is evidence that Yarbrough was on his lunch break from 12:30 p.m. to 1:30 p.m. Neither side points to evidence regarding when plaintiff

left the health unit after his initial appointment. There is evidence that plaintiff was already being treated for the scalding when Yarbrough returned from lunch, which would indicate plaintiff was scalded sometime before 1:30 p.m.

Unescorted, plaintiff walked back to the 3-G dayroom. Defendant Ray was in the control booth where he could see the dayroom and other areas. Plaintiff told Ray that two gangs had hits out for plaintiff and plaintiff requested that Ray escort him to his cell. Ray looked at plaintiff while plaintiff was talking, but did not respond to plaintiff. After waiting a few minutes, plaintiff went down to the second floor central hallway to look for Yarbrough or another officer to escort him and lock him into his cell. Plaintiff glanced onto other wings, but found no officers other than those in the control booth. Plaintiff returned to the 3-G dayroom, where Ray stared at him from the control booth. The control booth officer has a clear view of the wing hallways as well.

Plaintiff waited there for a few minutes and then headed back down the stairs to look for an officer to escort him. Plaintiff encountered defendant Wright and told him about the two gang hits and requested that Wright lock him in his cell. Wright told plaintiff to go to 3-G and he would send a gallery officer there. Plaintiff went to the wing, but no officer arrived to meet him.

Felton was assigned to the cell next to plaintiff's, a fact known by all the defendants. Plaintiff had conversations with Felton and Felton had previously borrowed legal papers from plaintiff. While plaintiff waited near his own cell, Felton called him and told plaintiff to retrieve his papers. Plaintiff said he would send a guard for the papers, but Felton threatened to throw away the papers if plaintiff did not take them at that time. Felton placed the papers in the chuckhole in his door, which did not have a covering or flap. When plaintiff reached for the papers, Felton pulled a stinger out of a cup and threw a cupful of boiling water at plaintiff's face, scalding plaintiff's face, arm, and back.

After being scalded, plaintiff rushed off the wing in view of Ray who was still in the control booth. Plaintiff ran to McAdory's office and thereafter went to the Health Care Unit where he was treated. Plaintiff was then transferred to the hospital for further treatment.

After his initial hospital treatment, plaintiff was placed in X-House. After a second round of hospital treatments, plaintiff was placed in protective custody in H-House, where he remained until September 18, 1996.

During the time period shortly before April 1996, a number of correctional officers had been scalded by inmates using hot water. Approximately a week before plaintiff was scalded,

Felton had scalded another 3-G inmate. In that incident, Felton tricked the inmate into coming close to Felton's chuckhole and then threw hot water. The inmate informed McAdory and a number of other officers about the incident. The inmate cannot recall the names of the other officers. The inmate requested a transfer away from Felton, but it was not granted.

Felton was on Stateville's list of staff assaulters. He had a reputation as being a major problem and extremely violent. Among the corrections officers, Felton had a reputation for throwing things out of his chuckhole and reportedly had scalded people with water on a number of occasions. He had thrown things at Ray and Yarbrough. Yarbrough specifically testified that he knew to be cautious around Felton's cell. Ray, McAdory, and Yarbrough all testified that they knew of Felton's reputation for throwing things through his chuckhole. It can be inferred that Wright was also aware of Felton's reputation. Ray admitted that allowing an inmate to walk past Felton's cell, even escorted, placed the inmate in substantial risk, especially if Felton had a specific desire to harm that inmate. Also, it is admitted that all the defendants were aware that Felton was a Gangster Disciple.

Plaintiff testified that, prior to April 12, 1996, he himself was unaware of Felton's violent reputation. He does not

dispute that he had spoken with Felton prior to that date and had voluntarily lent Felton the legal papers.

When originally processed at Stateville, plaintiff reported that the Gangster Disciples and Northsiders had hits out on him. This information was placed in his prison file. Prior to April 1996, plaintiff told McAdory of the hits and asked to be kept in administrative hold in the hospital or another safe location. Approximately March 22, 1996, plaintiff again spoke to McAdory about the threat from Gangster Disciples and asked to be transferred off 3-G.

Stateville maintains a register known as the "Offender Tracking Systems." Benner had not declared Felton as a person to be kept separated from plaintiff. Plaintiff did specifically name two Gangster Disciples housed in 3-G as threats to him. On March 29, 1996, plaintiff sent McAdory a letter requesting that he be transferred to the 2-F Wing in Unit I, which plaintiff believed to be safer because it was controlled by Latin Kings, who were opponents of at least one of the gangs that had threatened plaintiff.

McAdory had the authority to move inmates to avoid problems. This included the authority to place an inmate in administrative hold in the Unit I hospital.

Because of the large number of Gangster Disciples and other gangs at Stateville, it was not always possible to separate

an inmate from all other members of a threatening gang or gangs. Additionally, Stateville officials only acted on threats they considered to be sufficiently verified. Also, being single-celled in disciplinary segregation was not any less protective than protective custody.

"[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994) (quoting Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d 556, 558 (1st Cir.), cert. denied, 488 U.S. 823 (1988)); Luttrell v. Nickel, 129 F.3d 933, 935 (7th Cir. 1997); Lewis v. Richards, 107 F.3d 549, 552 (7th Cir. 1997). "Failure to provide such protection, however, violates the Eighth Amendment's prohibition of cruel and unusual punishment only if 'deliberate indifference by prison officials [to the prisoner's welfare] effectively condones the attack by allowing it to happen[.]'" Lewis, 107 F.3d at 553 (quoting Haley v. Gross, 86 F.3d 630, 640 (7th Cir. 1996)). In order to recover from prison officials, "a plaintiff must show both an objective risk of danger and actual knowledge of that risk on the part of the custodial staff." Weiss v. Cooley, 230 F.3d 1027, 1032 (7th Cir. 2000). See also Swofford v. Mandrell, 969 F.2d 547, 549 (7th Cir. 1992). A plaintiff may establish liability by showing that the defendant was aware of a substantial risk of serious injury to the prisoner, but

nevertheless failed to take appropriate steps to protect the prisoner from a known danger. Weiss, 230 F.3d at 1032 (quoting Payne v. Churchich, 161 F.3d 1030, 1041 (7th Cir. 1998), cert. denied, 527 U.S. 1004 (1999)). Also, a systemic lapse in enforcement of a policy critical to ensuring prisoner safety could be sufficient to show deliberate indifference violating the Eighth Amendment. Steidl v. Gramley, 151 F.3d 739, 741 (7th Cir. 1998) (quoting Goka v. Bobbitt, 862 F.2d 646, 652 (7th Cir. 1988)).

Evidence supports that prisoners in Unit I occasionally broke away or were left unescorted, but there is no evidence of a systemic failure to enforce the policy of requiring escorts. Also, the evidence does not support deliberate indifference to a failure to stop stingers from being smuggled into Unit I. Cf. Duane v. Lane, 959 F.2d 673, 677 (7th Cir. 1992). Therefore, it must be determined whether plaintiff has shown an objective risk of danger to him in particular and, if so, whether each particular defendant was aware of that danger. Also, as to each defendant, it must be shown that that defendant's deficient performance was a cause of plaintiff being attacked by Felton. See Babcock v. White, 102 F.3d 267, 271 (7th Cir. 1996); Robinson v. Detella, 1996 WL 745412 *2 (N.D. Ill. Dec. 24, 1996); Crist v. Waznis, 1995 WL 769272 *1-2 (N.D. Ill. Dec. 29, 1995); Adams v. Peters, 1995 WL 699711 *8 (N.D. Ill. Nov. 24, 1995).

On the facts presently assumed to be true, on more than one occasion, McAdory was informed the Gangster Disciples had a hit out for plaintiff. McAdory was also aware that Felton, a particularly dangerous Gangster Disciple, was assigned to the cell next to plaintiff. Felton was not one of the Gangster Disciples specifically named by plaintiff as making threats, but plaintiff reported that the entire gang had a hit out for him. Also, a failure to protect claim does not require that the plaintiff specifically identify the attacker as a threat prior to the occurrence of the attack. See Farmer, 511 U.S. at 843-44, 849 n.10; Giroux v. Somerset County, 178 F.3d 28, 33 (1st Cir. 1999); Holland v. DeBruyn, 1997 WL 284813 *8 (N.D. Ind. March 6, 1997); Hill v. Godinez, 955 F. Supp. 945, 949 (N.D. Ill. 1997). McAdory was actually aware of the danger represented by placing plaintiff in an area where each trip out of his cell could result in his passing in the vicinity of a particularly dangerous Gangster Disciple who was known to throw things at passersby. On the evidence presently before the court, it must be assumed that there were other possible locations where plaintiff could be kept away from members of the gangs that had threatened him. But even if it were assumed that no location could be found that kept plaintiff separated from all Gangster Disciples and Northsiders and that a single cell in segregation was as safe as even

protective custody, it would not be exercising due care to place plaintiff near a particularly dangerous Gangster Disciple.

However, while it may have been negligent to place plaintiff in 3-G, it does not amount to deliberate indifference on McAdory's part. Felton was prone to attack guards and prisoners; there is no evidence he limited himself to attacking (or was more prone to attack) Gangster Disciple enemies. Others besides Felton had to be housed in 3-G and plaintiff's own testimony is that he had previously gotten along with Felton. But even if the placement near Felton constituted deliberate indifference, the placement is not the proximate cause of plaintiff being scalded. Plaintiff could have stayed at sick call instead of wandering on his own through Unit I. And even after he went to 3-G, he could have stayed in the 3-G dayroom, which apparently was out of range of Felton and was devoid of other prisoners. It was plaintiff's own decision to go to Felton's chuckhole that was the proximate cause of his injury. McAdory's conduct was not deliberate indifference nor a proximate cause of plaintiff's injury; therefore the claim against McAdory will be dismissed.

Since it was plaintiff's own decision to approach Felton's cell, the conduct of the other three defendants also would not be a proximate cause of plaintiff being injured. Additionally, the evidence does not support that the other

defendants were deliberately indifferent. While it may have been negligent for Ray to fail to immediately call for other guards, Ray did not instruct plaintiff to leave the dayroom and go near the cells. Ray was able to observe plaintiff, and given Unit I's escort policy, plaintiff was unlikely to encounter other prisoners. Plaintiff's risk of danger was not so high that it could be found that Ray was deliberately indifferent absent Ray specifically sending plaintiff to stand outside Felton's cell. Similarly, Wright only sent plaintiff to 3-G; he did not instruct plaintiff to go beyond the dayroom. Wright did not send plaintiff to stand outside Felton's cell. It cannot be inferred that Wright was deliberately indifferent. The claims against Ray and Wright will be dismissed.

As to Yarbrough, the claim is even weaker. Yarbrough knew of the danger represented by being near Felton, but there is no evidence that Yarbrough knew plaintiff was a subject of a Gangster Disciple or Northsider hit. More importantly, there is no evidence that Yarbrough knew plaintiff would be released from the sick call and permitted to return to his cell unescorted. It is true that Yarbrough permitted plaintiff to go part way to the sick call unescorted, but plaintiff was not attacked on his way to the sick call. There is no evidence regarding Yarbrough's responsibility to retrieve plaintiff from sick call. There is no evidence that Yarbrough was supposed to stay with plaintiff

during the sick call visit nor any evidence that Yarbrough was called to pick up plaintiff from sick call. The only evidence is that Yarbrough was the gallery officer for 3-G on that day. While that may have made him responsible for escorting plaintiff back, there is no evidence showing that was his responsibility nor how he was to be alerted to pick up plaintiff. Moreover, it would appear Yarbrough was on a lunch break at the time plaintiff was attacked. It cannot be found that Yarbrough acted with deliberate indifference to a known risk or that he was a cause of plaintiff being attacked by Felton. The claim against Yarbrough will be dismissed.

IT IS THEREFORE ORDERED that defendants' motion to strike [88-1] is denied without prejudice. Defendants' motion for summary judgment [76-1] is granted. The Clerk of the Court is directed to enter judgment in favor of defendants and against plaintiff dismissing plaintiff's cause of action with prejudice.

ENTER:

_____
UNITED STATES DISTRICT JUDGE

DATED: APRIL /2/, 2001